IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

OCT 12 2001

Margarita

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| DAVID RUIZ, et al.<br>Plaintiffs, | §<br>§<br>§ | United States Courts<br>Southern District of Texas<br>ENTERED |
| UNITED STATES OF AMERICA,<br>Plaintiff-Intervenor, | §<br>§<br>§ | OCT 12 2001<br>Michael N. Milby, Clerk of Court |
| v. | § | Civil Action No. H-78-987 |
| GARY JOHNSON, et al.,<br>Defendants. | §<br>§<br>§ | |
| HON. JOHN CULBERSON, et al.,<br>Defendant-Intervenors | §<br>§<br>§<br>§<br>§ | |

## ORDER

Upon evidence presented at the 1999 evidentiary hearing, the findings made by the Court in its opinions of March 1, 1999 and June 18, 2001, the decision of the Fifth Circuit Court of Appeals of March 20, 2001, the submissions of the parties pursuant to the Court's order filed April 4, 2001, the Joint Report of Parties On Failure to Reach Agreed Form of Judgment and the attachments to it, and taking judicial notice of the entire record in this civil action, it shall be, and is hereby,

**ORDERED, ADJUDGED** and **DECREED** as follows:

<u>Use of Force</u>

1.    This order supplements the Order signed June 18, 2001, requiring that Defendants enforce written policies governing when and how force and chemical agents are permitted to be used by TDCJ-ID personnel against prisoners,

-1-

reporting and internal investigation requirements when force is used or is alleged to have been used, and discipline of employees for violations of the policies and procedures.

2.  Defendants shall take reasonable steps to foster and enforce compliance with their written policy "that force shall be used only when necessary and only to the extent necessary to gain compliance," and provide a reasonable period of formal instruction to correctional officers in implementing Defendants' guidelines that, whenever possible, employees should (a) make every effort to anticipate and defuse situations that might give rise to conflict, confrontation and violence and (b) use listening, reasoning and attempting to calm prisoners and stabilize a situation and avoid escalation to conflict and force.

In its June 18, 2001 Memorandum Opinion, the Court found that there was a "culture of sadistic and malicious violence" involving officers' threat and use of force as a primary method of control and to punish prisoners. The result is "a system-wide prevalence of resorting to force more often and to a greater degree than necessary or constitutionally permitted." June 18, 2001 Memorandum Opinion ("Me. Op.") at 20. The Court found a failure by officers to use reasonable measures to try to avoid or minimize the use of force. *Id.* at 21. The Court found that unnecessary and excessive force was forbidden by TDCJ policies, quoting a provision from the Use of Force Plan that has since been modified. *Id.* at 20, n. 27; *See* Joint Report Exh A at 01 483 - 538, particularly 01 483 and 01 495.

It is found that this proposed remedial measure is narrow and directly

        targeted at the core of the constitutional violation found by the Court. It is found that it is not intrusive because it requires Defendants to do nothing more than enforce their own policies, and allows them to retain discretion over how to enforce those policies. It is found that this remedial measure is all the less intrusive, as Paragraph 20 below permits Defendants to modify their policies.

3.        Defendants shall take reasonable steps to ensure that employee major use of force participant statements specifically describe (a) the efforts made to anticipate and avoid a situation where force would be necessary, or to manage resistance or confrontation without force; (b) the facts that made the force necessary; (c) the entire interaction involving the use of force; and (d) the force used. Defendants shall require detail sufficient to permit meaningful evaluation of employee conduct in terms of the requirements of policy and procedure.

        It is found that this measure is necessary to correct Defendants' constitutional violations in the area of use of force, as the Court has previously found that prison officials permit officers to submit overly general incident reports and turn a blind eye to unexplained injuries. 37 F. Supp. 2d at 939. The Court further credited the findings of plaintiffs' expert, Allan Breed, that officers statements were "practically identical (*Id*. at 938), which is characteristic of conclusory reports. The Court found that Defendants' management of use of force was largely by paperwork review. *Id*. at 940. The paperwork review cannot serve as a meaningful management tool unless reports contain sufficient factual detail to permit meaningful evaluation of employee conduct in terms of policies. It is found that this remedy is the least intrusive method of ensuring that

Defendants' reports contain sufficient detail.

4. Defendants shall take reasonable steps to determine the reasons that most use of force reports are filed without prisoner participant or witness statements and to ensure that statements are obtained from all prisoner participants and witnesses who are willing to provide them. The absence of prisoner statements, with Defendants' lack of concern for whether prisoners provide statements, contribute to what the Court found was Defendants' failure to supervise use of force by (i) allowing officers to submit overly general reports, (ii) turning a blind eye to unexplained injuries and (iii) going through the motions of filing paperwork. 37 F.Supp.2d at 939-40. It is found that this remedy is sufficiently narrow and not intrusive, as it merely requires that Defendants take steps to remedy their suspect supervision of the use of force by including in their reports such information as is reasonably available from prisoners.

5. Defendants shall take reasonable steps to ensure (a) that there are investigations of major use of force incidents involving (i) allegations or admissions of offensive force (e.g., punches, kicks, use of batons or other objects to strike offensively), (ii) take downs of prisoners in restraints, or (iii) either multiple visible injuries or any injury requiring more than first aid treatment and (b) that the investigations (i) include at least interviews of prisoner participants and interviews of available identifiable percipient witnesses for whom the investigator does not have written statements covering all relevant facts within the witnesses' knowledge, (ii) are adequate in depth and completeness to determine whether staff complied with Defendants' use of force policies and procedures;

and (iii) result in reasoned findings based on evidence concerning each employee's compliance with all policies and procedures implicated by the facts, allegations and evidence.

The Court found "a pattern of punitive 'uncalled for 'slamming,' hitting and kicking' of prisoners by officers" and that "prison officials abdicate their responsibility in the area of supervision of use of force." Mem. Op. at 21; *see also* 37 F.Supp.2d at 939-40. The failure of supervision amounts to "an affirmative management strategy to permit use of force for both punishment and deterrence." 37 F.Supp.2d at 940. As noted above, the Court found that Defendants' failure of supervision included turning a blind eye to injuries and uncritical acceptance of overly general use of force reports with prisoner statements. Another is IAD/OIG-ID's going through the motions of filing paperwork without using the review and investigative process to find misconduct when there is misconduct. 37 F.Supp.2d at 940; *see also id.* at 934 (retaliatory/punitive punching condemned by defense as well as plaintiff's experts ratified by IAD). It is found that this provision is narrowly tailored to address these findings, and it avoids being intrusive by allowing Defendants full discretion to determine how and by whom the investigation will be conducted.

6. By April 1, 2002, Defendants shall file a report describing all steps taken to comply with this order in the area of use of force and any additional documents updating or supplementing the information provided with the parties' September 17 Joint Report, including a representative sample of major use of force reports and IAD/OIG-ID reports, that the parties deem appropriate for demonstrating the

effect of measures taken to improve management and supervision of use of force since the 1999 hearing and the state of compliance with this Order. If the parties are unable to agree on the materials that Defendants will provide, they shall report that to the Court by March 1, 2002, and the Court will resolve the conflict. It is found that this provision is the narrowest, least intrusive means of monitoring and documenting measures taken to cure the constitutional violation in the area of use of force.

### Safety/Protection

7. Defendants shall enforce written policies governing the protection of prisoners from violence and victimization by other prisoners. It is found that this provision is narrowly tailored to correct Defendants' constitutional violations in the area of prisoner safety and protection, and that it is not intrusive because it requires Defendants to do nothing more than enforce their own policies, and allows them to retain discretion over how to enforce those policies. It is found that this remedial measure is all the less intrusive, as Paragraph 20 below permits Defendants to modify their policies.

8. Defendants shall take reasonable steps to ensure that there is no prison unit or section of a unit in which it is routine for at least some prisoners to have to fight to protect themselves or submit to extortion (including paying commissary for "protection"). As part of these steps, Defendants shall effectively inform unit wardens that they are responsible for maintaining control of their units so that violence and paying protection are not commonplace in any area, and for informing higher level officials if and when there is any area of their prison unit

where violence and paying protection are routine, so that regional or central offices can take steps to assist unit officials in regaining control. Defendants shall effectively inform employees that prison security is inadequate on any prison unit or wing where violence and victimization are commonplace and of their responsibility and role in preventing, detecting and reporting violence and victimization. Defendants shall monitor data concerning violence, extortion and requests for protection for indications that prisoner victimization might be routine at one or more units.

The Court found that prisoners are routinely subjected to violence, extortion and rape, that officers are aware of the victimization and fail to respond, and that an "institutional resistance to resolving serious safety problems pervades the system," which involves a deliberate "lack of control by prison officials." 37 F.Supp.2d at 915, 928,29; see also, Mem. Op. at 11-12. The Court found that Defendants had an unwritten systemic policy essentially denying protection to prisoners who failed to fight and be injured attempting to protect themselves (37 F.Supp.2d 855, 925-26; Mem. Op. at 12), which reflects an acceptance of routine violence and victimization, and a failure to attempt to exercise control to prevent it. It is found that this provision directly addresses this central component of the constitutional violation and so is necessary and narrow. It is not intrusive because it is consistent with Defendants' policies.

9. Defendants shall enforce written polices to protect prisoners from their personal enemies and members of gangs who have targeted them by housing them in separate areas or on separate prison units (including housing the target

prisoners in protective custody when that level of protection is necessary) as soon and for as long as their employees know or should know that there is a significant risk that the targeted prisoner will be physically or sexually assaulted absent such separation. It is found that this provision is narrowly targeted at the findings summarized above and additional findings that high barriers keep prisoners out of safekeeping and protective custody and that prisoners are forced to subject themselves deliberately to disciplinary sanctions in order to separate themselves from enemies and predators (37 F.Supp.2d at 923, 928-29). The Court found that "prison officials at all levels play a game of willing disbelief [of prisoners' claims of fear and danger], one that appears adequate on paper and fails dismally in practice." *Id.* at 928. TDCJ's central failure to provide protection is a failure to "separate" those at risk of harm from those who would harm them. As above, it is found that this remedy is not intrusive, as it requires no more than that Defendants enforce their own written policies.

10. Defendants shall enforce written policies to protect vulnerable prisoners from those who would victimize them by housing the vulnerable prisoners in special housing such as transient housing, safekeeping, protective custody, single cell status and prison units or sub-units known by Defendants to be relatively free of gang activity, violence and victimization, as soon and for as long as their employees know or should know that there is a significant risk that the vulnerable prisoner will be physically or sexually assaulted or subjected to extortion absent such separation. Again, it is found that this remedy is narrow and not intrusive, as it requires no more than that Defendants enforce their own written policies.

11.     Defendants shall take reasonable steps to ensure that no prisoner is housed in a cell or housing area where the employees responsible for the housing placement know or should know that the prisoner is likely to be assaulted or forced to pay protection. This provision is necessary to address Defendants' failure to require employees to take reasonable action to mitigate a substantial risk of serious harm of which they are aware. The Court found essentially that Defendants' policy does not require employees to mitigate a mere substantial risk of serious harm such as the policies requiring prisoners to show injuries or to identify the particular individuals who pose the risk and excusing prison officials from even assessing the risk posed to a prisoner on a particular unit or section of a unit.

12.     Defendants shall take reasonable steps to ensure that the characteristics and factors that they know to be associated with vulnerability or susceptibility to being targeted for harm by other prisoners, when observed or verified, are credited as "objective evidence" substantiating prisoners' subjective feelings of danger, and that vulnerable and targeted prisoners are not required to fight or suffer injuries before they are transferred or housed in safekeeping or protective custody. Prisoners with the characteristics and factors associated with vulnerability or susceptibility to being targeted for harm shall not be transferred from one unit where there is a substantial risk of serious harm to another similar unit where the risk of harm is similar even if not yet proven by threats or attacks at the second unit. Again, this order does no more than require Defendants to act in accord with their own written polices and procedures, in this instance so as not

-9-

               to disregard the factors that they list as being associated with vulnerability and victimization (small size, effeminacy, vulnerable character or passivity, evidence of threats, enemies, youth, developmental impairment, conviction of sex crimes with children, history of being raped in prison).

13.        Defendants shall require that employees who investigate prisoner requests for protection obtain and consider all reasonably available evidence relevant to a determination of whether a prisoner requires protection and, if so, what kind of protection is required. Defendants shall require a reasonably equivalent quality of evidence, investigation and reasoning to justify recommendations or decisions denying protection as they require to justify recommendations or decisions granting protection, and sufficient documentation of recommendations and decisions to show the quality of evidence, investigation and reasoning. It is found that this requirement is narrowly aimed at curing Defendants' constitutional violations in the area of prisoner protection and safety, and that it is the least intrusive method of ensuring that investigations of prisoner requests for protection are aggressively and completely pursued.

14.        By April 1, 2002, Defendants shall file a report describing all steps taken to comply with this Order in the area of prisoner protection and any additional documents updating or supplementing the information provided with their September 17 Joint Report, including documentation of a representative sample of protection requests and dispositions, to demonstrate measures taken since the 1999 hearing to comply with this Order and to improve the system for protecting prisoners from the risk of violence and victimization inflicted by other prisoners

and the effect of these measures. If the parties are unable to agree on the materials that Defendants will provide, they shall report that to the Court by March 1, 2002, and the Court will resolve the conflict. This is the narrowest, least intrusive method for monitoring and documenting measures taken to cure the constitutional violations in the area of prisoner protection.

**Administrative Segregation**

15.      By December 1, 2001, Defendants shall serve and file a report describing in detail (a) the work performed by the psychologist they have retained to evaluate mental health services (including the identification of mentally ill prisoners), and (b) the psychologist's findings and conclusions as they relate to the presence of seriously mentally ill prisoners in administrative segregation at units visited by the psychologist. The report shall describe the activities of the psychologist (documents reviewed, physical facilities visited, prisoners evaluated, staff interviewed, etc.) and the approximate time taken to perform each of the major activities. The report shall describe with particularity the efforts undertaken to identify seriously mentally ill prisoners (*e.g.*, review of unit lists of psychotically ill prisoners in segregation, review of unit lists of former patients treated for psychotic illnesses that generally persist for the life of a person correctly diagnosed with them, walking runs and asking forthcoming correctional employees and prisoners to identify possibly mentally ill prisoners). The report shall specify the evidence on which its conclusions are based and be signed by the psychologist. With the psychologist's report, Defendants shall file a report of any actions taken to address any findings of the psychologist, and any other actions

-11-

taken to exclude or remove from segregation prisoners whose mental illness puts them at enhanced risk of decompensation there. It is found that this order is the narrowest and least intrusive approach to remedying Defendants' constitutional violations in the area of administrative segregation, as it gives Defendants the opportunity to use the consultant that they have hired to seek out prisoners not receiving services they require as part of developing a plan to resolve the constitutional violations.

16. By December 15, 2001, Defendants shall file a plan to ensure that seriously mentally ill prisoners for whom the conditions of administrative segregation are injurious or pose a significant risk of serious deterioration in their mental status are not housed in regular administrative segregation, but are rather housed in inpatient mental health hospitals or other facilities appropriate for the level of mental health care that they require. The plan shall include provisions for identification and tracking of such seriously mentally ill prisoners, their exclusion from regular administrative segregation and their confinement in facilities appropriate for the level of mental health monitoring and care they require. The plan shall describe any new facilities or programs to be developed for seriously mentally ill prisoners who do not meet Defendants' criteria for inpatient mental health care and who require a form of segregation but will no longer be housed in regular administrative segregation. The plan shall include a timetable for its implementation.

17. By January 15, 2002, plaintiffs may file objections to Defendants' report and plan concerning mental illness and administrative segregation, on the grounds

that they do not meet the requirements of paragraphs 15 and 16 above and that the plan will not eliminate the constitutional violation by the court. Also by January 15, 2002, plaintiffs may file a motion requesting discovery concerning the presence of seriously mentally ill prisoners in administrative segregation and any matter raised in their objections.

18.    If there are no objections filed pursuant to the preceding paragraph, then by April 1, 2002, Defendants shall file a report describing all steps taken to implement their plan and any additional documents updating or supplementing the information provided in their September 17 Joint Report that the parties deem appropriate for demonstrating the steps taken by Defendants to implement their plan and the effect of those measures. If the parties are unable to agree on the materials that Defendants will provide, they shall report that to the Court by March 1, 2002 and the Court will resolve the conflict.

19.    Defendants shall not limit in-cell possession of consumable hygiene materials, basic reading and writing materials and postage, radios or fans based on segregation status or level of segregation. Defendants shall allow all segregated prisoners who have been in segregation status for longer than 90 days and in a reduced level of segregation for longer than 90 of 360 days, the same recreation opportunity as policy currently provides for Level 1 prisoners. It is found that this remedial order is the narrowest, least intrusive method of providing a "bottom line" for the provision of the basic necessities of life for prisoners in long-term, segregated confinement, as it effectively addresses the physical and psychological needs of segregated prisoners without compromising

-13-

Defendants' interest in security.

### General Order and Termination of Jurisdiction

20. Nothing in this Order shall deprive Defendants of the discretion to amend their current policies and enforce the amended policies in the place of policies referred to in this Order.

21. By June 1, 2002, plaintiffs may file objections to termination of jurisdiction in any or all of the three substantive areas that are covered by this Order and a motion for continued or more specific relief, on the grounds that Defendants have failed to comply with this Order and unconstitutional conditions remain. In the absence of a pending motion or objection, or further order to the contrary, Defendants shall be relieved of the operation of this Order and jurisdiction shall terminate on July 1, 2002.

22. Plaintiffs' counsel will be relieved of their obligations to the class with respect to issues as to which relief from judgment has been granted pursuant to the terms of this Order and, except as to a matter on which a motion or objection is pending, they will be relieved of their obligation to the class on all other issues on July 1, 2002.

SIGNED this /2th day of October, 2001.

William Wayne Justice
Senior United States District Judge
Eastern District of Texas
Sitting by designation